JAMES H. BEALS, executor, & others *vs.* HORACE JAMES & others.

Norfolk.    March 15, 16, 1899. — June 30, 1899.

Present: HOLMES, MORTON, LATHROP, BARKER, & HAMMOND, JJ.

*Betterment — Notification of Town Meeting — Smelt Brook in Brookline — Notice of Intention to take Land — Statute — Construction of covered Channel and Catch Basins — Removal of Surface Water — Validity of Assessment — Form of Procedure — Notice of Assessment.*

It is not essential to the validity of the notice given by an officer under the warrant for a town meeting, pursuant to Pub. Sts. c. 27, § 54, requiring that the meeting shall be notified in the manner prescribed by the by-laws of the town, that notice shall be given also of the intention of the selectmen to call the meeting, the by-law of the town providing that " the selectmen, whenever it is possible, shall, before calling any town meeting, post notices of their intention so to do," if the provision of the by-law relating to service of the warrant has been complied with.

Upon the evidence in this case, which was a petition for a writ of certiorari to quash proceedings of the selectmen of Brookline in levying a betterment assessment upon land for the expense of improving the channel of Smelt Brook in that town, under St. 1887, c. 99, a finding that the brook is within the statute was warranted.

If the return of an officer, who is directed to serve a notice of the intention of the selectmen of a town to take land for a public improvement, under St. 1887, c. 99, states that as to the particular persons named in the warrant he made service either by giving to them or their agents or representatives in hand, or by leaving at their last and usual place of abode, " a true and attested copy of the same," and two of the persons so named, upon a petition by them for a writ of certiorari to quash a betterment assessment for the expense of such improvement, do not offer evidence that no notice was received by them, and it appears that both early knew of the work and made no objection, they fail to show that due notice of the intention to make the improvement was not given to them.

Under St. 1887, c. 99, authorizing the selectmen of a town, for the purposes of surface drainage, to improve the brooks and natural streams flowing through the town by widening the same, removing obstructions therein, diverting the water and altering the courses or deepening the channels thereof, and to take land therefor, the selectmen may construct on land taken with brick and mortar a

water tight covered channel with a subdrain beneath it discharging into the channel by chimneys, and may construct also on land outside of that taken catch basins for a temporary purpose which are subsequently covered up by filling.

The benefit arising from the use of a drain constructed under the authority of St. 1887, c. 99, for removal of surface water, is assessable upon the estates benefited, and the amount of this benefit is not to be considered upon a petition for a writ of certiorari to quash the assessment, but upon a petition for an abatement.

It is no objection to the validity of a betterment assessment on lands for the expense of improving a brook channel, which lands were all the lands occupying the lowest part of the watershed and all of those which abutted on the brook and from which the waters of the brook were diverted, that owners of higher lands from which surface water passed through the lands of others into the channel were not assessed.

The objection, that the petitioner cannot be charged for drawing off waters unlawfully collected and precipitated upon his premises, cannot be raised upon a petition for a writ of certiorari to quash a betterment assessment on his land for the expense of improving a brook channel, but should be raised in a proceeding for an abatement.

Although notice of the assessment of a betterment upon land is directed to the heirs of the estate, if it is received by the executor and trustee under the will of the owner, he being the person who should have received it, and in time to appeal to a jury, he has no ground to complain that proper notice of the assessment was not given.

PETITION for a writ of certiorari to quash the proceedings of the selectmen of Brookline in levying a betterment assessment on the estates of the respective petitioners for the expense incurred in laying out an improvement of Smelt Brook, under St. 1887, c. 99. Hearing before *Knowlton*, J., who reported the case for the consideration of the full court. The facts appear in the opinion.

*A. M. Lyman*, (*E. S. Page* with him,) for the petitioners.

*C. A. Williams*, for the respondents.

HAMMOND, J. In considering the questions arising in this case, we take them in the order in which they are stated upon the brief of the petitioners.

1. It is contended that the town meeting of March 30, 1895, at which St. 1887, c. 99, was accepted, was not called according to law. This was an annual town meeting, and the provisions for the call of such a meeting are found in Pub. Sts. c. 27, §§ 54, 55, which, so far as material, are as follows:

" Sect. 54. Every town meeting shall be held in pursuance of a warrant under the hands of the selectmen, directed to the constables or to some other persons appointed by the selectmen for that purpose, who shall forthwith notify such meeting in

the manner prescribed by the by-laws or by a vote of the town. The selectmen may by the same warrant call two or more distinct town meetings for distinct purposes. Sect. 55. The warrant shall express the time and place of the meeting, and the subjects to be there acted upon."

The by-law of the town in existence at that time, so far as material, was as follows:

" The selectmen, whenever it is possible, shall, before calling any town meeting, post notices of their intention so to do in at least ten places in the town at least fifteen days before the time for such meeting. Printed notifications of all annual town meetings shall be left at the place of residence of every legal voter in the town at least four days before the day upon which the meeting is to be held; all other town meetings may be notified by printed notices posted in at least twenty public places in the town, and by publication in any newspaper published in the town or in the city of Boston, and that said publication be at least twenty-four hours before the time of said meeting. The notifications shall in all cases contain an enumeration of all subjects specified in the warrant."

It is not denied that printed notifications of the meeting were left at the place of residence of every legal voter, in accordance with the by-law, but it is said that it does not appear that the selectmen posted notices of their intention to call the meeting in at least ten places in the town at least fifteen days before the time for such meeting, and that consequently the respondents have failed to show that the town meeting was legally called. A short answer to this might be that it does not appear that such notice was not given, and that, the matter not being one of public record, it may be assumed as against the petitioners, in the lack of evidence to the contrary, that the thing was rightly done. But we are of opinion that the meeting was notified according to law.

The provision of § 54 is that the meeting " shall be held in pursuance of a warrant under the hands of the selectmen, directed to the constables or to some other persons appointed by the selectmen for that purpose, who shall forthwith notify such meeting in the manner prescribed by the by-laws or by a vote of the town." This is not a notice of an " intention " to call a meeting, but it

is the call itself, and the call is to be made as prescribed by the by-law. It is definite. The warrant must specify the time and place of the meeting, and the subjects to be acted upon. It is manifest that the first sentence of the by-law has no reference to the way in which the person into whose hands such a warrant is placed by the selectmen shall notify the meeting under this section, and, inasmuch as the part of the by-law relating to the service of the warrant was complied with, the town meeting was legally notified.

It is doubtless a convenient practice for the selectmen to announce publicly some days in advance that they intend to call a meeting, but such an announcement cannot be regarded as a part of, or as essential to the validity of, the notice given by an officer under the warrant, which is the only notice that, under the statute, is to be given according to the law of the town.

2. The next objection is that the finding of the single justice that Smelt Brook was a brook or natural stream within the meaning of St. 1887, c. 99, was not warranted by the evidence. It can serve no useful purpose to repeat here the evidence. It is sufficient to say that it amply justifies, if it does not require, the finding.

3. The third objection is that the petitioners were not served with a legal notice by the selectmen of their intention to take the land of the petitioners. No question is made as to the form of the warrant, but the allegation is based upon the form of the return of the officer who made the service. The statute requires that at least seven days prior to the taking a written notice of the intention of the selectmen to take shall be " left by them, or by their order, at the usual place of abode of the owners of the land over which such way is proposed to be laid out or altered, or . . . delivered to such owner in person or to his tenant or authorized agent. If the owner has no such place of abode in the town, and no tenant or authorized agent therein known to the selectmen, or if, being resident of the town, he is not known as such to the selectmen or road commissioners, such notice shall be posted up in some public place in the town seven days at least before the laying out of such way." Pub. Sts. c. 49, § 67.

At the time of the proceedings for the laying out, the owners of the land upon which the assessments now in controversy were

subsequently made were James H. Beals, the father of Beals the petitioner, and Peter Graffam, one of the petitioners. They were particularly named among others in the warrant, and the officer was instructed to make service upon them by giving to each of them in hand, or into the hand of the tenant or authorized agent of such persons, a true and attested copy of the warrant, or by leaving such copy at the usual place of abode of such persons in the town of Brookline seven days at least before the day appointed for the hearing. And the officer was also directed to notify the said persons, and any and all other persons and corporations, if any, who might be interested, by posting up true and attested copies of the warrant in three public places in the town seven days at least before the day appointed for said hearing.

The answer recites that the notice was duly served, as appears by the return of the officer, a copy of which is given. By the return the officer says that he has notified the persons " to appear as herein directed, by either giving to them or their agents or representatives, in hand, or by leaving at their last and usual place of abode, a true attested copy" of the warrant; and that he has " notified all other persons or corporations by posting printed attested copies" of the warrant " in at least three public places in said Brookline, all of which was done seven days at least before the day of said meeting."

It does not appear that either Beals or Graffam had at that time any last and usual place of abode in the town, or any tenant or authorized agent there, or that if they had any such abode it was known to the selectmen. Indeed, outside the officer's return, the presumption would be from facts stated in the papers before us that neither of them had any such abode or tenant or authorized agent in the town. The lands appear to have been vacant and unimproved, and Beals at the time of his death in 1896 was a resident of Boston, and Graffam, at the time of bringing his petition in April, 1897, is described as of Malden. If either had no such abode or tenant, then the posting of the printed attested copies of the warrant in three public places was sufficient as to him.

However that may be, the officer states that, as to the particular persons mentioned in the warrant by name, he made service

either by giving to them or their agents or representatives in hand, or by leaving at their last and usual place of abode, "a true attested copy of the same." It is true he has not named the persons whom he considered to be the agents or representatives, nor has he used the precise language of the statute; but we think a fair construction of the return to be, that, so far as concerns service of this kind, he sought for a tenant or authorized agent and found some one whom he supposed to be such. Moreover, Graffam, who testified in the case, did not testify that he received no notice. Nor did the petitioner Beals attempt by any testimony to show that none had been given to his testator; and it further appears in the case that both Beals and Graffam early knew of the work, and made no objection.

We are of opinion that the petitioners have failed to show that due notice of the intention of the laying out was not given; but, on the contrary, there is ample evidence to warrant the conclusion that due notice was given to them.

4. The fourth objection is that the work done was illegal and not authorized by St. 1887, c. 99. It is plain that the selectmen assumed to act under that statute, and the respondents do not claim that the work done was legal unless authorized by the statute.

In considering this question it is to be assumed, as stated above, that the finding that Smelt Brook was within the statute is correct. The selectmen, therefore, were justified in dealing with it, and the objection raises the question whether they went further than the statute authorized. The provisions of the statute, so far as material, are as follows:

"Section 1. The selectmen of the town of Brookline, for the purpose of surface drainage, may, within the limits of said town, improve the brooks and natural streams flowing in or through said town, by widening the same, removing obstructions in or over the same, diverting the water, altering the courses or deepening the channels thereof; and the more effectually to make said improvements may take land, in fee simple or otherwise, not exceeding four rods in width, on either side of the present channels of any such brook or natural stream, or for new channels into which said waters or any surface waters may be diverted, within the limits of said town."

The second and third sections provide that in taking land and assessing damages the proceedings shall be the same as in the laying out of highways.

The fourth section provides for the assessment of benefits upon estates specially benefited.

It appears that this was a sluggish brook, which ran for some distance through a piece of low, wet, marshy ground, in that part of the town which was being settled quite rapidly, and then continued through other lands to the Charles River.

It must be conceded that the proceedings of the selectmen were somewhat radical. They made no attempt to follow the tortuous course of the brook, but liberally made use of the power to alter its course; yet in substance they adhered to the general course of the stream, and the effect of their work was to provide an improved outlet for the surface water which theretofore had been discharged through it. Having decided upon the alterations in the course of the stream, they took the necessary land and constructed with brick and mortar a water-tight covered channel, after the manner of an ordinary sewer, with a subdrain beneath it discharging into this channel by chimneys. This subdrain seems to have been built for two reasons; first, because it was necessary to draw off the water while the channel was being constructed, and secondly, because it would aid in carrying off the water after the completion of the work.

When the work was completed, the small, sluggish, and tortuous brook had entirely disappeared for several hundred feet, where it had run through the land of the petitioners and others, and in the place thereof was this water-tight sewer-like channel of brick and mortar underground, into which water could not get except through this subdrain several feet below the surface of the ground, or through the catch basins which had been erected by the respondents, or through some artificial entrance to be made into the channel for that purpose.

The petitioners contend that this kind of work was not authorized by the act. They claim that the purpose of the act was to preserve in the main the appearance and character of the brook as such, and make it more efficient in its office of carrying away surface water as a brook; that the work done has in effect

destroyed the brook as such, and has substituted another method of taking care of the surface water.

On the contrary, the respondents contend that by the very language of the act they have the right to alter the course of the stream; that in a thickly settled locality such as there is every reason to suppose this soon will be, and which it is rapidly coming to be, it is not wise to undertake to leave uncovered such a stream as this was; that it soon becomes a receptacle for all kinds of objectionable matter, and a menace to public health; that under the circumstances the best treatment of the stream was to cover it up for a considerable distance, and the best way to cover it up was the one adopted.

They further contend that the landowners have the right so to connect their land with this covered channel as to carry away surface water; and that the channel is constructed to carry away such water, and not sewage.

As to the catch basins they answer as follows:

" The respondents admit that while the work of constructing the improvement was being done they constructed upon the estates of divers persons immediately adjoining the land in which the new and improved brook channel was being built, fourteen catch basins, four of which were on said land formerly belonging to the petitioner Beals; that all of the catch basins were located by them outside of the strip of land taken for the improvement; that the catch basins consisted of cavities in the soil, having walls of stone laid up dry without cement or mortar, and having perforated iron covers to admit of the free entrance of ground and surface water into the basins; and that the free outflow of the water was provided for by open jointed drains extending from the catch basins to and into the main channel hereinafter referred to; that it was thought that the catch basins might be of some temporary assistance in draining the land until such time as the land should be filled up, but that the catch basins were merely temporary expedients for assisting in the drainage of the land of the petitioner and others only until such time as the land should be filled, and were of no permanent value for draining the land; that it was expected that the catch basins would be covered up eventually by the material used in filling the land, and that the land has in fact been filled up by

the said Newhall, the purchaser thereof as aforesaid,* and the catch basins have been covered up by the filling ; that the catch basins were all constructed openly while the work of constructing the improved channel was being done."

It does not appear that the petitioners, or any of the other owners of the land in which the catch basins were constructed, ever made any objection to their construction. We do not see that any harm was done to the petitioners by their construction. They have been since covered up, and their existence or construction would not under these circumstances justify the granting of this petition. As to the rest of the work, the selectmen were public officers designated for the performance of the work authorized by the statute, and they are to judge of the manner in which it shall be done, provided always they keep within the power granted to them.

The work here was radical, and the change was great; but after a careful consideration of the statute and the physical features of the problem before the selectmen, we are not prepared to say that, as applied to the circumstances, the work done by them was not authorized by the statute.

5. The fifth objection is that the assessments were based upon the illegal ground that the petitioners had the right to enter their private drains into said main channel.

6. The sixth objection is based upon a similar claim. As to this, the answer of the respondents is as follows:

" The respondents say that the new main channel was and is, and was intended to be, a channel into which not only the waters of Smelt Boook, but other surface waters on the estates through which it passed, could be diverted, and that the channel was laid out and constructed in such a manner, at such a depth, and with such an inclination that the owners of the lands assessed for a betterment therefor can enter their particular drains into the same for the purpose of ridding their estates of all surface water that may fall thereon, and was built with this object and end in view, and is especially adapted to this purpose."

It thus appears that the particular drains were intended for

---

* The answer alleged that Beals, as executor, conveyed the land in question to Benjamin B. Newhall, and that the petitioner was not the owner of the land.

the diversion of surface waters, and this was authorized by the act. It does not appear that the assessment was for using the drain as a sewer. The benefit arising from the use of the drain for removal of surface water was assessable. The amount of this benefit was to be considered not in this suit, but in a petition for an abatement.

7. The seventh objection is that the court erred in excluding evidence that estates other than those assessed were similarly affected, and that if the seven estates assessed were properly assessed, other estates should likewise have been assessed. As to this the report of the justice recites that " The petitioners offered to show that estates other than the seven assessed for betterment taxes were affected in the same way as were the estates of the petitioners, and that if the estates of the petitioners were properly assessable, then these other estates whose lands had surface water from them draining into the drain were likewise assessable"; and further recites that " The petitioners did not contend that there were other persons than those assessed whose lands abutted on the brook or drain in the town of Brookline above the place where the drain terminated, but contended that there were no special benefits properly assessable to the petitioners, and that, if there were, assessments ought to have been made upon such other persons as owned lands from which surface water passed through the lands of others into the drain."

It appears that the lands assessed were all the lands which occupied the lowest part of the watershed, and all of those which abutted upon the brook, and were the only estates from which the waters of the brook were diverted.

The owners of the higher lands were not benefited. The water from their land was taken care of by the law of gravitation, and they needed no help from the town. The simple fact that such water, after going over other land, went finally into the brook, was not a reason for assessing a benefit. Brook or no brook, it flowed away from their land, and its subsequent course was of no consequence to them.

8. The question raised by the eighth objection, that " the petitioners cannot be charged for draining off waters unlawfully collected and precipitated upon their premises," should be raised in a proceeding for abatement, and not in this proceeding.

9. The ninth objection is that no proper notice of the assessment was given. All of the petitioners except Beals have waived this, and as to him we think he has no reasonable ground of complaint. Although the notice was directed to the heirs of the estate it was received by Beals, and he was the person who should have received it. He received it in time to appeal to the jury, and he had substantially the same notice and knowledge of the assessment as he would have had if the notice had been directed to him as trustee. He suffered no injury in this respect. *Lawrence* v. *Nahant,* 136 Mass. 477.

In view of our decision upon the main questions, it becomes unnecessary to consider those arising upon the pleadings and the defence of laches.

The petitioners have failed to show that substantial justice requires the issuing of the writ.

*Petition denied.*